# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **MANOUCHEHR JAFARZADEH &** **SHAHNAZ KARAMI,** | |
| **Plaintiffs,** | |
| **v.** | Civil Action No. 16-1385 (JDB) |
| **KIRSTJEN NIELSEN, Secretary, U.S.** **Department of Homeland Security, et al.**[1] | |
| **Defendants.** | |

## MEMORANDUM OPINION

All that is old in this case has been made new again. Manouchehr Jafarzadeh, an Iranian national seeking to become a lawful permanent resident ("LPR") of the United States, alleges that his application was placed in a government program that delays and denies immigration petitions on overly broad national security grounds. The government filed a motion to dismiss the first complaint in this matter, arguing, among other things, that the issues in the case must be adjudicated in removal proceedings, to which the government had already consigned Jafarzadeh. The Court granted the motion as to some aspects of the complaint, but rejected the idea that the Court lacked jurisdiction and denied the motion as to most of the claims raised. That complaint has since been amended, but the new version includes many of the same allegations and causes of action as the original. And the government has responded in kind, with another motion to dismiss that raises many—but not all—of the same arguments it raised the first time around. As before, the Court finds that it has jurisdiction, and that some—but not all—claims can proceed.

---

[1] Kirstjen Nielsen, Secretary of Homeland Security, and L. Francis Cissna, Director of the U.S. Citizenship and Immigration Services, have been automatically substituted for their predecessors pursuant to Federal Rule of Civil Procedure 25(d).

**BACKGROUND**

Jafarzadeh is an Iranian citizen who has lived legally and continuously in the United States since he entered the country on a student visa in 1979. See Am. Compl. [ECF No. 30] ¶ 8. He has been married since 1982 to plaintiff Shahnaz Karami, an Iranian citizen and American LPR who has continuously resided in the United States since 1978. Id. ¶¶ 7, 9. Plaintiffs have three adult daughters, all of whom are American citizens and reside in the United States. Id. ¶ 9. Jafarzadeh worked for the Interests Section of the Islamic Republic of Iran, which is housed in the Pakistani Embassy in Washington, D.C., from June 1991 until he was denied LPR status in 2017. Id. ¶ 20.

On January 25, 2010, plaintiffs' daughter Razeyeh filed a Form I-130 Petition for Alien Relative on behalf of Jafarzadeh, and Jafarzadeh concurrently filed a Form I-485 Application to Register Permanent Residence or Adjust Status as her immediate relative. Id. ¶¶ 1, 21. Both petitions remained pending at the U.S. Citizenship and Immigration Services (USCIS), a component of the Department of Homeland Security (DHS), for over six years. Id. ¶ 21. During those years, Jafarzadeh was interviewed twice by USCIS—once in 2011 and once in 2014—and was interviewed or contacted a number of times by the Federal Bureau of Investigation (FBI). Id. ¶¶ 22–23. Jafarzadeh believed, based on the "content and nature of these interviews," that the FBI wanted him to become a government informant, id. ¶ 24, and that the FBI "would have used its power to remove the roadblocks hindering the adjudication of his applications before USCIS" if he had agreed, id. ¶ 25. Jafarzadeh cooperated with the agents' questioning, but refused to become an informant. Id. He also "consistently denied ever having provided support to, expressed support for, or of having engaged in, terrorism or terrorist-related activity." Id. ¶ 26.

For six years, USCIS did not act on Jafarzadeh and Razeyeh's applications. Plaintiffs allege that the applications were funneled into a secret, alternate claims-processing system known

as the Controlled Application Review and Resolution Program (CARRP), which was created in April 2008. Id. ¶¶ 26, 28–29. Plaintiffs allege that applications on this separate track "are reviewed under protocols that lack any authority or foundation in statute or regulation," and which "mandate[] denial or perpetual delay" of those applications, "regardless of the applicant's statutory eligibility for a particular immigration benefit." Id. ¶ 33.

Plaintiffs further contend that applications are selected for inclusion in CARRP if the applicant is a "Known or Suspected Terrorist" ("KST"), which in turn is based on whether the individual is listed in the "Terrorism Screening Database" ("TSDB"); or is a "Non-Known or Suspected Terrorist[]" ("non-KST"), meaning she has an "articulable link to . . . an activity, individual or organization that has engaged in terrorist activity or been a member of a terrorist organization." Id. ¶¶ 30–32 (internal quotation marks omitted). According to plaintiffs, the TSDB is maintained by the FBI, and that agency, among others, is authorized to add individuals to the database. Id. ¶¶ 31, 34. Under CARRP, once an individual is deemed a KST, USCIS field officers are prohibited from granting that immigration application, "even if the applicant has satisfied all statutory and regulatory criteria." Id. ¶ 38. Thus, plaintiffs argue, CARRP unlawfully delegates authority over immigration to the FBI and other agencies that add names to the TSDB. Id. ¶ 56. Plaintiffs also allege that CARRP requires USCIS to deny applications on national security grounds far broader than those listed in the Immigration and Nationality Act (INA). Id. ¶¶ 47, 56.

Jafarzadeh and Razeyeh filed this action in June 2016, more than six years after filing their applications with DHS. The original complaint challenged CARRP on a number of administrative and constitutional grounds. On December 2, 2016, USCIS granted Razeyeh's petition, thereby recognizing Jafarzadeh as her immediate relative. See Collett Decl. [ECF No. 12-1] ¶ 3; Pls.' Response [ECF No. 21] at 1. But on February 10, 2017, USCIS denied Jafarzadeh's application

for adjustment of status and placed him in removal proceedings. See Collett Decl. ¶¶ 4–5; USCIS Decision [ECF No. 15-2]; Notice to Appear [ECF No. 17-1]. The government argued that because plaintiffs sought an order requiring USCIS to act on their applications, their complaint had become moot. See Defs.' Mot. to Dismiss [ECF No. 12] at 7–8. DHS also asserted that the relief plaintiffs sought can only be obtained through the administrative process before an immigration judge ("IJ") and the Board of Immigration Appeals (BIA), followed by appeal to the appropriate circuit court. See Defs.' Reply Br. [ECF No. 17] at 5–7 & n.1. Additionally, DHS argued that plaintiffs' claims should be dismissed on the merits. Defs.' Mot. to Dismiss at 8–12.

In September 2017, the Court granted in part and denied in part defendants' motion to dismiss the case. See Sept. 7, 2017 Order [ECF No. 25]; Mem. Op. [ECF No. 26]. The Court first determined that the claim seeking adjudication of Jafarzadeh's and Razeyeh's petitions was moot, but that the other claims in the case—seeking invalidation of CARRP and a new adjudication free of CARRP—were not. See Mem. Op. at 8–10. The Court then found that the claims remaining in the case were ripe and free of finality or exhaustion concerns, because Jafarzadeh did not seek review of the ultimate decision USCIS had made on his LPR application (which would have to go through the administrative process outlined above) but rather had brought a collateral challenge to the procedure by which his application had been adjudicated—a claim which, under the reasoning of McNary v. Haitian Refugee Center, Inc., 498 U.S. 479 (1991), the text of the INA did not funnel into the administrative process. See Mem. Op. at 10–20.

After determining that it had jurisdiction to hear the case, the Court dismissed plaintiffs' claim to compel compliance with the INA, reasoning that the same claim could be and had been asserted under the Administrative Procedure Act (APA) and that neither the Mandamus Act nor the Court's inherent power to correct ultra vires agency action applied when relief was available

elsewhere. See id. at 20–22. Because the government's only response to plaintiffs' substantive APA claim was that it was moot—an argument the Court rejected—the Court denied the motion to dismiss that claim. See id. at 22. The Court denied without prejudice the motion to dismiss plaintiffs' notice-and-comment claim, observing that the Court did not have enough information to resolve the issue because neither party had placed any CARRP materials in the record. See id. at 22–23. However, the Court granted the motion to dismiss plaintiffs' due process claim, finding that Jafarzadeh had no liberty or property interest protected by the Due Process Clause and that Razeyeh had not asserted such an interest herself. See id. at 23–25, 25 n.7. Finally, the Court found that joining the Director of the Executive Office of Immigration Review (EOIR) as a defendant, as plaintiffs requested, was unnecessary because the Attorney General was already a defendant and "is certainly empowered to grant the relief sought." Id. at 25–26.

Plaintiffs have since filed an amended complaint. See Am. Compl. The new complaint substituted Karami, Jafarzadeh's wife, for his daughter Razeyeh as the second plaintiff. Otherwise, the amended complaint makes factual allegations essentially identical to those in the original. Plaintiffs also bring many of the same claims for relief, though they have adjusted some in response to the Court's prior opinion. They claim that USCIS must re-adjudicate Jafarzadeh's LPR application "exclusive of CARRP" (Count I), id. ¶¶ 49–53; that CARRP violates the separation of powers by creating criteria and procedures not authorized by the INA (Count II), id. ¶¶ 54–57; that CARRP violates the APA because it is not in accordance with the INA or the Constitution (Count III), id. ¶¶ 58–59; that adjudicating Jafarzadeh's application under CARRP without explanation or a process to challenge his subjection to CARRP violates Karami's due process rights to family unity and the maintenance and enjoyment of her marriage in the United States (Count IV), id. ¶¶ 60–64; and that CARRP is an agency rule that was improperly promulgated without notice and

comment in violation of the APA (Count V), id. ¶¶ 65–70. The government has filed a motion to dismiss the amended complaint, which is now ripe for decision. See Defs.' Mot. to Dismiss Pls.' Am. Compl. ("2d Mot. to Dismiss") [ECF No. 31].

## LEGAL STANDARD

Defendants have moved to dismiss this case both for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6). On a motion to dismiss for lack of subject-matter jurisdiction, a plaintiff "bears the burden of showing that he has standing." Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009). The plaintiff "must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." Town of Chester v. Laroe Estates, Inc., 137 S. Ct. 1645, 1650 (2017) (citation omitted). At the motion-to-dismiss stage, plaintiffs must plead facts that, taken as true, render it plausible that the Court has subject-matter jurisdiction. See Humane Soc'y of the U.S. v. Vilsack, 797 F.3d 4, 8 (D.C. Cir. 2015). The Court must take all facts alleged in the complaint as true and make all reasonable inferences in plaintiffs' favor. Id. The Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." See Gulf Coast Mar. Supply, Inc. v. United States, 867 F.3d 123, 128 (D.C. Cir. 2017) (citation omitted).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Plaintiffs cannot meet this standard through "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Iqbal, 556 U.S. at 678. Likewise, a court need not accept a plaintiff's legal conclusions, even if they are dressed up as factual allegations. See Sickle v. Torres Advanced Enter. Sols., LLC, 884 F.3d 338, 345 (D.C. Cir. 2018). However, just

as with Rule 12(b)(1) motions, courts must accept as true all facts stated in the complaint and make all reasonable inferences in plaintiffs' favor. Id.

## ANALYSIS

### I. JURISDICTION

The government raises—with varying degrees of explication—four arguments why the Court lacks jurisdiction over plaintiffs' suit. They claim: (1) the case is moot; (2) the INA strips the Court of jurisdiction while Jafarzadeh is in removal proceedings; (3) plaintiffs lack Article III standing; and (4) the statute of limitations has run. The Court will examine each assertion in turn.

#### A. Mootness

The government first argues that the case is moot because USCIS has already adjudicated Jafarzadeh's application, depriving the Court of a live controversy. This assertion formed "[t]he government's primary argument" in its first motion to dismiss. Mem. Op. at 8. The Court held that plaintiffs' claims were rendered moot only "[t]o the extent that the relief the plaintiffs seek is an order requiring USCIS to act on their application." Id. The Court therefore dismissed the count in the original complaint that challenged USCIS's delay and requested a final decision, but dismissed plaintiffs' INA and substantive APA claims only to the extent that they sought that same relief. See id. at 8–10. The Court denied the motion to dismiss those claims to the extent they sought other relief, "e.g., a declaratory judgment that CARRP is unlawful and a remand for USCIS to reconsider Jafarzadeh's application without applying CARRP." Id. at 10. The Court also denied the motion to dismiss plaintiffs' due process and notice-and-comment claims. Id. The government has pointed to no "intervening circumstance" between September 2017 and the present that "deprives the plaintiff of a 'personal stake in the outcome of the lawsuit'" so as to render the case moot now. Genesis Healthcare Corp. v. Symczyk, 569 U.S. 66, 72 (2013) (citation omitted).

However, the government also argues that, because the IJ can make a de novo determination of Jafarzadeh's eligibility for LPR status "that is not affected by either USCIS's decision or CARRP," the Court cannot grant any meaningful relief beyond what Jafarzadeh can already receive in removal proceedings. 2d Mot. to Dismiss at 8; see Reply in Supp. of Mot. to Dismiss ("Reply") [ECF No. 33] at 6–7. Therefore, the government asserts, "[a]ny opinion issued at this point would be an impermissible advisory opinion." 2d Mot. to Dismiss at 9; Reply at 7.

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013) (citation omitted). Here, the question is whether plaintiffs still have a legally cognizable injury that gives them an interest in the outcome of this case. For reasons explained in Part I.C, infra, the answer to that question is yes: Jafarzadeh has suffered a procedural injury which continues to affect his concrete interests in remaining and working in this country. Renewing Jafarzadeh's application in the removal proceedings will not cleanse him of his injury, unless the IJ actually grants him LPR status. The Court, by sending Jafarzadeh's application back to USCIS for reconsideration, would be able to provide plaintiffs one chance more at achieving LPR status than they would receive from an IJ alone—a fact that suffices to keep the case alive. See Knox v. SEIU, Local 1000, 567 U.S. 298, 307–08 (2012) ("A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." (citation and internal quotation marks omitted)). Thus, the government has not met its "heavy burden" of proving mootness. Honeywell Int'l, Inc. v. Nuclear Regulatory Comm'n, 628 F.3d 568, 576 (D.C. Cir. 2010).

## B. The INA and Jurisdiction-Channeling

In its opinion on the first motion to dismiss, the Court determined that 8 U.S.C. § 1252(a)–(b), which channels to an administrative process most claims relating to orders of removal, did not strip the Court of jurisdiction over the claims in this case. See Mem. Op. at 10–20.[2] Now, however, the government argues that "[a]ny injunction granting Plaintiffs the relief they seek would . . . run afoul of" another subsection of this same provision, 8 U.S.C. § 1252(g). 2d Mot. to Dismiss at 11; see Reply at 5. That subsection reads, in relevant part: "[N]o court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g). Thus, while § 1252(a)–(b) channels claims to the circuit courts, § 1252(g) deprives all courts of jurisdiction. The government puts § 1252(g) forward primarily as a question of what remedy the Court can provide, and therefore of redressability—a question explored further below. However, the government also argues that this subsection is clear enough to preclude the Court's jurisdiction over plaintiffs' claims under

---

[2] At times in its briefing and at oral argument, the government once again raised § 1252(a)–(b). The Court is unpersuaded by these attempts to relitigate its reading of those provisions. However, the government did raise two points at argument that merit attention. First, the government cited the Second Circuit's decision in Rajah v. Mukasey, 544 F.3d 427 (2d Cir. 2008), to claim that circuit courts can review the legality of government programs in the course of reviewing a final order of removal. The regulations challenged in Rajah were published in the Code of Federal Regulations, and the petitioners argued that they were facially invalid on a number of grounds. See id. at 434–43. Here, by contrast, plaintiffs challenge a program some of the details of which have been withheld from the public, and Jafarzadeh's subjection to which the government refuses to admit. Some of plaintiffs' claims thus require developing a record, which was not the case in Rajah. In any event, foreclosure of judicial review is only one of several "general guideposts" used to determine whether a claim must be channeled to an administrative review process. See Jarkesy v. SEC, 803 F.3d 9, 17 (D.C. Cir. 2015). The Court has already explained why all these guideposts point away from applying the INA's exclusive review mechanism to plaintiffs' claims. See Mem. Op. at 10–20.

Second, government counsel suggested that § 1252(b)'s jurisdiction-routing provision does not prevent Jafarzadeh from developing a record upon which a circuit court can review CARRP's legality, because 28 U.S.C. § 2347(b)(3) allows a circuit court to "transfer the proceedings to a district court" for fact-finding in certain instances. This provision, however, does not alter the Court's determination that it has jurisdiction under McNary. Section 2347(b)(3), by its terms, does not apply unless "the agency has not held a hearing before taking the action of which review is sought by the petition." Though final orders of removal are subject to § 2347, see 8 U.S.C. § 1252(a)(1), they cannot be entered until the IJ has held a hearing to determine whether an individual is removable, see 8 U.S.C. § 1229a(a)–(c)(1)(A); 8 C.F.R. § 1240.10. Thus, § 2347(b)(3)'s transfer option will not be available to Jafarzadeh.

the McNary decision. See Reply at 5 n.3. It is therefore necessary to determine whether § 1252(g), unlike § 1252(a)–(b), strips the Court of jurisdiction over this case.

The Supreme Court has rejected a broad reading of § 1252(g)'s scope, holding that it "applies only to [the] three discrete actions" explicitly mentioned in the text—that is, to the Attorney General's "'decision or action' to 'commence proceedings, adjudicate cases, or execute removal orders." Reno v. Am.-Arab Anti-Discrimination Comm. ("AAADC"), 525 U.S. 471, 482 (1999) (quoting 8 U.S.C. § 1252(g)). Section 1252(g) does not apply to the "many other decisions or actions that may be part of the deportation process." Id. In this case, plaintiffs challenge CARRP and its use in Jafarzadeh's LPR application procedure. The agency actions they challenge are separate from—and, indeed, predate—any decision or action to commence or adjudicate Jafarzadeh's removal proceeding. Therefore, on a plain-text reading of the statute, plaintiffs' claims do not "aris[e] from" any of the actions enumerated in § 1252(g). All the more so since the Supreme Court has "not interpret[ed] this language to sweep in any claim that can technically be said to 'arise from'" those actions, but rather has read it only to refer to "those three specific actions themselves." Jennings v. Rodriguez, 138 S. Ct. 830, 841 (2018). Indeed, at least two circuits have explicitly held that challenges to actions predating the decision to initiate removal proceedings are not subject to § 1252(g)'s jurisdictional bar. See Kwai Fun Wong v. United States, 373 F.3d 952, 965 (9th Cir. 2004); Humphries v. Various Fed. USINS Employees, 164 F.3d 936, 944 (5th Cir. 1999). Since plaintiffs' claims arise from the process by which Jafarzadeh's LPR application was handled, rather than from USCIS's ensuing decision to commence removal proceedings, § 1252(g) does not deprive this Court of jurisdiction.

The same factors that led the Court to find § 1252(a)–(b) inapplicable also confirm that § 1252(g) does not forbid review of plaintiffs' claims. The text of § 1252(g) does not expressly

limit district court jurisdiction for claims arising from events other than the three enumerated actions. See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 489 (2010). Nor does the text of any other provision in § 1252 limit jurisdiction over these collateral claims. See Mem. Op. at 16–20. Granted, some courts have refused to exercise jurisdiction over claims that fell outside the text of § 1252 when they were seen as indirectly attacking the plaintiffs' removal orders. See, e.g., Singh v. USCIS, 878 F.3d 441, 445–46 (2d Cir. 2017); Martinez v. Napolitano, 704 F.3d 620, 622 (9th Cir. 2012); Estrada v. Holder, 604 F.3d 402, 408 (7th Cir. 2010); Chen v. Rodriguez, 200 F. Supp. 3d 174, 182 (D.D.C. 2016). But see Zhang v. Napolitano, 604 F. Supp. 2d 77, 80 (D.D.C. 2009) ("Although it is apparent that Zhang's ultimate goal is to prevent the Attorney General from executing the removal order upheld by the First Circuit, his present claim seeks only to compel the USCIS to act on his asylum application . . . ."). But in all of those cases the plaintiffs had already received orders of removal, review of which is explicitly channeled to the courts of appeals, and were seeking indirectly to nullify those orders. Jafarzadeh has not yet had a merits hearing before an IJ, much less received an order of removal. Hence, this case is governed by the general rule: "claims falling outside the text of a jurisdiction-channeling provision . . . may proceed in the district court." Gen. Elec. Co. v. Jackson, 610 F.3d 110, 127 (D.C. Cir. 2010).[3]

Nor does the combination of provisions in § 1252(a)–(b) and § 1252(g) implicitly forbid review. "Provisions for agency review do not restrict judicial review unless the 'statutory scheme'

---

[3] Normally, "where a statute commits review of agency action to the Court of Appeals, any suit seeking relief that might affect the Circuit Court's future jurisdiction is subject to the exclusive review of the Court of Appeals." Telecomms. Research & Action Ctr. (TRAC) v. FCC, 750 F.2d 70, 75 (D.C. Cir. 1984). However, "the INA strips all courts of jurisdiction to review [USCIS] actions other than deportation decisions," and the TRAC rule does not apply when stripping district courts of jurisdiction would "deprive the plaintiffs of 'meaningful judicial review of their statutory and constitutional claims.'" Daniels v. Union Pac. R.R Co., 530 F.3d 936, 944 (D.C. Cir. 2008) (quoting McNary, 498 U.S. at 494).

displays a 'fairly discernible' intent to limit jurisdiction, and the claims at issue 'are of the type Congress intended to be reviewed within th[e] statutory structure.'" Free Enter. Fund, 561 U.S. at 489 (quoting Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 207, 212 (1994)). Certainly, § 1252 as a whole displays a discernible intent to limit jurisdiction. After all, § 1252(b)(9) is designed as a "general jurisdictional limitation" for "claims arising from deportation proceedings," and § 1252(g) "is specifically directed at the deconstruction, fragmentation, and hence prolongation of removal proceedings," AAADC, 525 U.S. at 482–83, 487. But the claims in this case are not of the type intended to be reviewed within the channeled structure of § 1252. The Court's previous analysis of § 1252(a)–(b), together with the above examination of § 1252(g), confirms that all of the criteria that weigh against jurisdiction-stripping apply here. See Free Enter. Fund, 561 U.S. at 489 ("[W]e presume that Congress does not intend to limit jurisdiction if 'a finding of preclusion could foreclose all meaningful judicial review'; if the suit is 'wholly collateral to a statute's review provisions'; and if the claims are 'outside the agency's expertise.'" (citation omitted)).[4]

Finally, "[a]ny lingering doubt about the proper interpretation of 8 U.S.C. § 1252[] would be dispelled by a familiar principle of statutory construction: the presumption favoring judicial review of administrative action." Kucana v. Holder, 558 U.S. 233, 251 (2010). This presumption has been "consistently applied" to "legislation regarding immigration, and particularly to questions concerning the preservation of federal-court jurisdiction." Id. It is assumed that Congress legislates in the shadow of this canon, and "[i]t therefore takes 'clear and convincing evidence' to

---

[4] These criteria, as well as the lack of a removal order in this case, differentiate it from the case DHS put forward as supplemental authority, Vetcher v. Sessions, CA No. 17-1743 (JEB), 2018 WL 2926166 (D.D.C. June 11, 2018); see Notice of Suppl. Authority [ECF No. 34]. In Vetcher, the plaintiff challenged the alleged inadequacy of the law library at the facility where he was being held, which supposedly prevented him from defending himself in removal proceedings. See 2018 WL 2926166, at *3. The court determined that this claim was "inextricably linked to the order of removal" that had been issued as a result of his removal proceedings, and that the plaintiff's claim was exactly the sort that the INA intended to be challenged alongside an order of removal. Id. at *4–5 (citation omitted). The court did review the plaintiff's claims regarding the length and conditions of his confinement. See id. at *5–6. Like those latter claims, the claims in this case run collateral to, and are not properly handled in, removal proceedings.

dislodge the presumption." Id. at 252 (citation omitted). As the preceding discussion indicates, "[t]here is no such evidence here." Id. Therefore, § 1252 does not deprive the Court of jurisdiction.

## C. Article III Standing

In addition to its arguments on mootness and jurisdiction-channeling, the government asserts that these plaintiffs lack standing to pursue this case. The government first contends that plaintiffs have suffered no injury and cannot receive relief on any of their claims, and then makes more particular arguments regarding plaintiffs' standing to bring their separation of powers claim.

### 1. *Standing for All Claims*

#### i. Injury-in-fact

The government claims that plaintiffs cannot identify a cognizable injury for standing purposes because they "have made no allegations that CARRP applies in immigration court, where Jafarzadeh . . . can renew his application for adjustment of status." 2d Mot. to Dismiss at 10. "CARRP is now irrelevant to [Jafarzadeh's] immigration proceedings," the government avers, and therefore "[Jafarzadeh] is currently receiving the relief that Plaintiffs seek": adjudication free of CARRP. Id. The government also asserts that plaintiffs have suffered no more than a speculative injury from USCIS's denial of Jafarzadeh's LPR application, because the IJ, BIA, or circuit court might still grant a renewed application during removal proceedings. See id. at 10–11.

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1548 (2016) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)). Here, plaintiffs have pled that they "are seeking to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs." Lujan, 504 U.S. at 572. "[A] bare procedural violation" does not create a

concrete injury if it does not "cause harm or present any material risk of harm." Spokeo, 136 S. Ct. at 1550. But plaintiffs can satisfy the injury-in-fact requirement if they plausibly allege facts showing that "(1) the government violated their procedural rights designed to protect their threatened concrete interest, and (2) the violation resulted in injury to their concrete, particularized interest." Ctr. for Law & Educ. v. Dep't of Educ., 396 F.3d 1152, 1157 (D.C. Cir. 2005).

Plaintiffs allege that the INA provides them with the right to a particular process in evaluating Jafarzadeh's LPR application, one that is based solely on statutory criteria and the agency's discretion rather than on CARRP's alleged mandate to deny applications for those the FBI has placed on a watch list. See Am. Compl. ¶¶ 45, 52 (citing 8 U.S.C. § 1255(a)). Likewise, they claim the Fifth Amendment provides them with a due process right to be told about and to appeal Jafarzadeh's placement in CARRP. See id. ¶ 63. Jafarzadeh has a concrete interest in his ability to travel and to work in the United States, see, e.g., Air Line Pilots Ass'n, Int'l v. Chao, 889 F.3d 785, 789 (D.C. Cir. 2018) ("potential job loss" confers standing), and Karami has a concrete interest in keeping her husband in the country, see Trump v. Hawaii, 138 S. Ct. 2392, 2416 (2018) ("[A] person's interest in being united with his relatives is sufficiently concrete and particularized to form the basis of an Article III injury in fact."). These concrete interests are undoubtedly injured by the alleged violation of the INA's and the Constitution's required processes, since plaintiffs claim the violations led USCIS to deny Jafarzadeh's application. That caused him to be "treated as an applicant for admission" without proper documentation, 8 C.F.R. §§ 245.2(a)(4)(ii); Collett Decl. ¶¶ 4–5, and thereby caused him to lose his previous eligibility to travel outside the United States under advance parole or to seek work authorization, see 8 U.S.C. § 1324a(a)(1), (h)(3); 8 C.F.R. §§ 245.2(a)(4)(ii), 274a.12(c)(9); 1 Shane Dizon & Nadine K. Wettstein, Immigration Law Service §§ 2:202, 2:204 (2d ed. 2018). Since plaintiffs' alleged right to recover for deprivation of

these processes "will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another," Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89 (1998) (citation omitted), plaintiffs have pled a procedural injury.

The government nevertheless argues that plaintiffs have no ongoing injury or imminent threat thereof, because the IJ will provide Jafarzadeh with a CARRP-free review of his application. But this assertion misunderstands the nature of the harm in a procedural injury case. In such cases, the procedural violation is almost always in the past; it is only the injury to the concrete interest protected by the procedural right that is ongoing. In Lujan, for instance, the Court provided two examples of cognizable procedural injuries: "the procedural requirement for a hearing prior to denial of [plaintiffs'] license application, or the procedural requirement for an environmental impact statement before a federal facility is constructed next door to them." 504 U.S. at 572. In those situations, the license will have already been denied without a hearing, and the deadline to conduct the environmental impact statement will have already passed. The fact that the plaintiff might apply for a license again the next year while his procedural challenge gets litigated, and may get a hearing in that second application process, does not mean that the injury to his concrete interest in the license from the prior procedural violation has suddenly ended—he still does not have the license. Nor would it negate the landowners' injury to their interest in avoiding having a federal facility next door if a second agency, with a separate duty to conduct an environmental impact study, does conduct such a study—because the facility may still be built.

Similarly, here, the alleged procedural violations stemming from CARRP continue to injure plaintiffs' concrete interests in travel, work, and maintenance of the marriage and family unit, even if a second, separate adjudicatory body (the IJ) may not commit the same violation. Plaintiffs' concrete interests remain injured; Jafarzadeh still cannot travel or work, and indeed now

finds himself in removal proceedings, where the injury to his interests is even more acute. Cf. Clinton v. City of New York, 524 U.S. 417, 430–31 (1998) ("Even if the outcome of [a] second trial is speculative, the reversal [of a ruling in a defendant's favor] . . . causes a significant immediate injury by depriving the defendant of the benefit of a favorable final judgment."). Unless the IJ actually grants a renewed LPR application—thereby addressing the injury—plaintiffs retain an injury in fact.[5]

### ii. Redressability

The government also claims that any injury plaintiffs have received would not be redressable because no relief is available. See 2d Mot. to Dismiss at 11–13.

This is a case in which "the claimed injury arises from an alleged failure on the part of the injury-causing party to adhere to a prescribed process in adjudicating the [plaintiff's] substantive rights, rather than from the substantive decision itself." Spectrum Five LLC v. FCC, 758 F.3d 254, 264 n.10 (D.C. Cir. 2014). Plaintiffs challenge the allegedly illegal process—fueled by CARRP—that USCIS used to adjudicate Jafarzadeh's right to LPR status, rather than the merits of USCIS's ultimate determination. Because Congress has "accorded [plaintiffs] a procedural right to protect [their] concrete interests"—"here, the right to challenge [unlawful] agency action" under the APA and Declaratory Judgment Act—plaintiffs "can assert that right without meeting all the normal standards for redressability and immediacy." Massachusetts v. EPA, 549 U.S. 497, 517–18 (2007) (citation omitted). For plaintiffs to have standing, there need only be "some possibility that the requested relief will prompt the injury-causing party to reconsider the decision

---

[5] Plaintiffs also allege that Jafarzadeh is injured, or is imminently likely to be, because the government may introduce evidence obtained through the CARRP process to oppose any renewed motion for adjustment of status before the IJ. See 8 C.F.R. §§ 1240.7, 1240.11(a)(3). Given that plaintiffs have plausibly pled a procedural injury, the Court need not determine whether this allegation—or the potential that Jafarzadeh could be subjected to a higher burden of proof to show admissibility before the IJ, see 8 C.F.R. § 1240.8(b)—independently provides injury-in-fact.

that allegedly harmed the litigant." Id. at 518. If plaintiffs are victorious in their suit here, they will win a declaration that CARRP is unlawful and an order requiring the remand of Jafarzadeh's case from immigration court to DHS so that USCIS can reexamine Jafarzadeh's application for adjustment of status without reference to CARRP. See Am. Compl. at 13. There is certainly "some possibility" that USCIS, faced with a court determination that CARRP is illegal and that it must hew to the strictures of the INA, would come to a different conclusion about Jafarzadeh's application. This is enough to allege redressability, particularly at the motion-to-dismiss stage.[6]

The government sees things differently, claiming that the "Court lacks jurisdiction over the type of relief Plaintiffs attempt to seek" because of § 1252(g). Reply at 5. But the question whether relief is in fact available under federal law is not part of the redressability analysis. Rather, it is part of the Rule 12(b)(6) inquiry into whether plaintiffs have a valid cause of action. As the Supreme Court has explained, "the fundamental distinction between arguing no cause of action and arguing no Article III redressability" is "that the former argument is not squarely directed at jurisdiction itself, but rather at the existence of a remedy for the alleged violation of . . . federal rights, which issue is not of the jurisdictional sort which the Court raises on its own motion." Steel Co., 523 U.S. at 96 (emphasis added) (citation and internal quotation marks omitted). So long as plaintiffs allege some remedy that, were it granted, would create "some possibility" of

_____

[6] The government argues that plaintiffs lack standing to seek equitable relief, because they do not plausibly allege that they will appear again before USCIS seeking a different adjustment of status and therefore will be subject to CARRP again. See 2d Mot. to Dismiss at 12–13. The government emphasizes City of Los Angeles v. Lyons, 461 U.S. 95 (1983), in which the Supreme Court found that a plaintiff who had been illegally choked by a police officer lacked standing to seek an injunction against the city to prevent future police chokeholds because his past injury was insufficient to show that he "was likely to suffer future injury from the use of the chokeholds by police officers," id. at 105. Here, however, plaintiffs do not allege an injury stemming from a single past event without "any continuing, present adverse effects." Id. at 102 (citation omitted). Rather, plaintiffs seek relief tethered to the ongoing injury that USCIS's alleged procedural violation inflicts on their concrete interests. And the relief they request—an order requiring officials to perform specific tasks, and a concomitant declaration that an agency action is unlawful—are common in administrative and constitutional cases with injuries similar to plaintiffs'. See, e.g., City of New York, 524 U.S. at 425 n.9; Massachusetts v. EPA, 249 F. App'x 829, 829 (D.C. Cir. 2007). Hence, unlike in Lyons and the cases it cites, which all involve past rather than ongoing injuries, here plaintiffs have standing to seek equitable relief.

17

"prompt[ing]" the government "to reconsider" its denial of Jafarzadeh's LPR application, plaintiffs will have plausibly pled redressability. Massachusetts, 549 U.S. at 518. This they have done. Hence, as the text of Rule 12(b)(6) suggests, any assertion that § 1252 prohibits the Court from granting the relief sought is properly addressed when analyzing whether plaintiffs have "state[d] a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6) (emphasis added); see Steel Co., 523 U.S. at 89, 96; Hamdi ex rel. Hamdi v. Napolitano, 620 F.3d 615, 628 n.15 (6th Cir. 2010).

### 2. *Standing for Separation of Powers Claim*

Plaintiffs assert that CARRP impermissibly intrudes on Congress's sole authority to "establish an uniform Rule of Naturalization." U.S. Const. art. I, § 8, cl. 4; see Am. Compl. ¶¶ 55–56. The government argues that plaintiffs lack standing to pursue this separation of powers claim, because only Congress would be injured by such a violation. See 2d Mot. to Dismiss at 14. This is an odd argument on the government's part. History provides a list as long as one's arm of cases in which private parties alleged injuries sufficient to bring separation of powers claims—and, indeed, often obtained relief. See, e.g., Patchak v. Zinke, 138 S. Ct. 897, 903–04 (2018); Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S. Ct. 2076, 2083 (2015); NLRB v. Noel Canning, 134 S. Ct. 2550, 2557 (2014); Free Enter. Fund, 561 U.S. at 487, 513; City of New York, 524 U.S. at 430–33, 449; Morrison v. Olson, 487 U.S. 654, 670 (1988); Bowsher v. Synar, 478 U.S. 714, 721, 736 (1986); INS v. Chadha, 462 U.S. 919, 935–36, 959 (1983); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 582 (1952).

The reason for this is clear. While Congress would certainly "suffer[] an[] invasion of a legally protected interest as a result of" a violation of the Uniform Rule of Naturalization Clause, 2d Mot. to Dismiss at 14, it is not the constitutional violation alone that provides plaintiffs with standing in separation of powers cases. Rather, that violation must itself cause a separate injury

to a plaintiff's interests, and it is that harm that provides standing to sue. In Patchak, for instance, an allegedly unconstitutional statute forbade Patchak from suing to prevent the federal government from taking a neighboring property—on which a Native American tribe wished to build a casino—into trust. 138 S. Ct. at 903–04. The alleged separation of powers violation most directly affected the federal judiciary rather than Patchak, as the statute at issue stripped the courts' jurisdiction over claims involving the fought-over property. Yet Patchak, who would be deprived of access to the federal courts and might be forced to live near a casino because of the statute, had standing.

The same principles apply here. At least two district courts in the past year have held that plaintiffs have standing to claim that agencies violated the Uniform Rule of Naturalization Clause. See Kirwa v. U.S. Dep't of Def., 285 F. Supp. 3d 257, 273 (D.D.C. 2018); Wagafe v. Trump, No. C17-0094-RAJ, 2017 WL 2671254, at *7 (W.D. Wash. June 21, 2017). Like Jafarzadeh and Karami, the plaintiffs in those cases alleged that "they suffered injury from having to undergo additional requirements not imposed by Congress." Kirwa, 285 F. Supp. 3d at 273. Plaintiffs allege that Jafarzadeh remains deprived of his rights to travel and work in this country, and Karami of her right to maintain her family unit here. These injuries allegedly stem from Jafarzadeh being subject to CARRP's requirements, which assertedly go beyond those imposed by Congress. As in Kirwa and Wagafe, then, plaintiffs have standing to bring their separation of powers claim.

### D. Statute of Limitations

In a footnote in its reply brief—"a dangerous place to put an important point," Sheikh v. Republic of Sudan, 172 F. Supp. 3d 124, 131 (D.D.C. 2016)—the government asserts that, "[i]nsofar as Plaintiffs argue that the 'final agency action' [being challenged] is the decision to adopt CARRP, they are well past the statute of limitations to challenge that decision," Reply at 11 n.5. The statute of limitations for claims against the federal government is set out at 28 U.S.C.

§ 2401(a): "[E]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." As both APA and constitutional challenges are subject to § 2401(a), the government's assertion could doom all of plaintiffs' claims. See Harris v. FAA, 353 F.3d 1006, 1009 (D.C. Cir. 2004) (APA claims); Impro Prods., Inc. v. Block, 722 F.2d 845, 851 n.12 (D.C. Cir. 1983) (constitutional claims); see also Spannaus v. U.S. Dep't of Justice, 824 F.2d 52, 55 (D.C. Cir. 1987) ("The law of this circuit is clear: the words 'every civil action' [in § 2401(a)] mean what they say.").

Normally, the government's decision to wait until its second-round reply brief to raise the statute of limitations issue would instead doom its own untimely argument. Statutes of limitations are among the defenses that must be "affirmatively state[d]" when "responding to a pleading." Fed. R. Civ. P. 8(c)(1). The government did not mention § 2401(a) in its first motion to dismiss— even though most of plaintiffs' claims were the same—and did not raise the issue in its motion to dismiss the amended complaint. As with other affirmative defenses, a defendant who does not invoke the statute of limitations "at the first available opportunity, typically in filing his first responsive pleading or motion to dismiss, has presumptively forfeited that right." Zuckerman Spaeder, LLP v. Auffenberg, 646 F.3d 919, 922 (D.C. Cir. 2011). And in any event, "hiding an argument [in a footnote] and then articulating it in only a conclusory fashion results in forfeiture." CTS Corp. v. EPA, 759 F.3d 52, 64 (D.C. Cir. 2014).

However, the D.C. Circuit "has long held"—for at least thirty-five years, see Walters v. Sec'y of Def., 725 F.2d 107, 112 n.12 (D.C. Cir. 1983)—"that section 2401(a) creates 'a jurisdictional condition attached to the government's waiver of sovereign immunity,'" P & V Enters. v. U.S. Army Corps of Eng'rs, 516 F.3d 1021, 1026 (D.C. Cir. 2008) (quoting Spannaus, 824 F.2d at 55). Under this reading, the statute of limitations "must be strictly construed" to limit

exceptions, Spannaus, 824 F.2d at 55, and cannot be forfeited—indeed, it must be raised by the Court sua sponte if the parties neglect it, see Hamer v. Neighborhood Hous. Servs. of Chi., 138 S. Ct. 13, 17 (2017).

In light of Supreme Court decisions, several judges in this district have recently questioned the D.C. Circuit's cases holding § 2401(a) to be jurisdictional. See, e.g., Burt Lake Band of Ottawa & Chippewa Indians v. Zinke, 304 F. Supp. 3d 70, 75 (D.D.C. 2018) (collecting cases); Appalachian Voices v. McCarthy, 989 F. Supp. 2d 30, 44 n.5 (D.D.C. 2013). The D.C. Circuit itself has also raised the issue several times but has avoided revisiting Spannaus and its other precedents, either because the parties did not question them or because it found that the issue was not dispositive. See Mendoza v. Perez, 754 F.3d 1002, 1018 n.11 (D.C. Cir. 2014); P & V Enters., 516 F.3d at 1027; Felter v. Kempthorne, 473 F.3d 1255, 1260 (D.C. Cir. 2007); Harris, 353 F.3d at 1013 n.7; see also Steel Co., 523 U.S. at 91 (warning that "drive-by jurisdictional rulings of this sort . . . have no precedential effect"). As neither the Supreme Court nor the D.C. Circuit has explicitly abrogated those precedents, the Circuit's original conclusion remains binding on this Court and must be followed "until the D.C. Circuit addresses it in the first instance." Mdewakanton Sioux Indians of Minn. v. Zinke, 264 F. Supp. 3d 116, 130 n.21 (D.D.C. 2017).[7]

---

[7] The Court notes, however, that the Circuit's precedents on this matter are questionable given intervening Supreme Court decisions. Spannaus's holding is premised on the idea that § 2401 is "attached to the government's waiver of sovereign immunity, and as such must be strictly construed." 824 F.2d at 55. However, in a long line of cases, the Supreme Court has replaced the presumption upon which Spannaus relied with an opposing one: that "[s]tatutes of limitations and other filing deadlines 'ordinarily are not jurisdictional'" and that a limitations period should be treated "as jurisdictional only if Congress has 'clearly stated' that it is." Musacchio v. United States, 136 S. Ct. 709, 716–17 (2016) (citations omitted). Even a cursory examination of "the 'text, context, and relevant historical treatment' of the provision at issue," id. at 717 (citation omitted), shows rather clearly that § 2401(a) is non-jurisdictional. A comparison to United States v. Kwai Fun Wong, 135 S. Ct. 1625 (2015), in which the Court held the neighboring statute of limitations, § 2401(b), to be non-jurisdictional, see id. at 1633, is helpful in such an analysis.

To begin with, § 2401(a)'s "text speaks only to a claim's timelines, not to a court's power." Id. at 1632. It states simply that a "civil action commenced against the United States shall be barred unless the complaint is filed within six years." 28 U.S.C. § 2401(a). Like § 2401(b), § 2401(a) "does not speak in jurisdictional terms": it neither "define[s] a federal court's jurisdiction over [civil] claims generally" nor "address[es] its authority to hear untimely suits." Kwai Fun Wong, 135 S. Ct. at 1633 (emphases added). True, the text bars "civil actions," while § 2401(b) bars "claims." But that difference in language does not transform a non-jurisdictional statute into a jurisdictional one.

Nevertheless, plaintiffs' claims are timely. The statute of limitations on civil actions against the government begins to run when "the right of action first accrues." 28 U.S.C. § 2401(a). When challenging agency activity, "the 'right of action first accrues on the date of the final agency action.'" Hardin v. Jackson, 625 F.3d 739, 743 (D.C. Cir. 2010) (quoting Harris, 353 F.3d at 1010). Still, Count III, plaintiffs' substantive APA claim, is not barred. So long as a plaintiff has standing, D.C. Circuit "case law makes it clear that '[a]n agency's regulations may be attacked . . . once the statutory limitations period has expired . . . on the ground that the issuing agency acted in excess of its statutory authority in promulgating them.'" Genuine Parts Co. v. EPA, 890 F.3d 304, 316 (D.C. Cir. 2018) (alteration in original) (quoting NLRB Union v. FLRA, 834 F.2d 191, 195 (D.C. Cir. 1987)); see Am. Scholastic TV Programming Found. v. FCC, 46 F.3d 1173, 1178 n.2 (D.C. Cir. 1995) (suggesting such challenges may be brought in "nonenforcement proceedings

See, e.g., Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154, 163, 169 (2010) (finding non-jurisdictional a statute of limitations that said "no civil action . . . shall be instituted" outside the time limits); Owens v. Republic of Sudan, 864 F.3d 751, 803 (D.C. Cir. 2017) (noting that courts have not "attached jurisdictional significance to the word 'action'"). Nothing in the text of § 2401(a) meets the Court's clear statement requirement.

Likewise, context points strongly against a jurisdictional reading. The Court "has often explained that Congress's separation of a filing deadline from a jurisdictional grant indicates that the time bar is not jurisdictional" Kwai Fun Wong, 135 S. Ct. at 1633; see, e.g., Reed Elsevier, 559 U.S. at 164. Such is the case here. As with § 2401(b), whose related jurisdictional grant is housed in a separate provision, see Kwai Fun Wong, 135 S. Ct. at 1633, § 2401(a)'s statute of limitations is separate from the general jurisdictional grant for civil cases against the federal government, see 28 U.S.C. § 1346(a)(2). As neither § 1346(a)(2) nor § 2401(a) conditions jurisdiction on the limitations period, "[t]reating § 2401[(a)]'s time bars as jurisdictional would . . . disregard the structural divide built into the statute." Kwai Fun Wong, 135 S. Ct. at 1633.

Finally, the history of the statute does not contradict what these other sources suggest. Section 2401(a) was derived from the Little Tucker Act, which once shared a statute of limitations with the Big Tucker Act, see Herr v. U.S. Forest Serv., 803 F.3d 809, 817 (6th Cir. 2015)—a law whose statute of limitations is jurisdictional, see John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 132–34 (2008). But in 1948, Congress altered the Little Tucker Act's statute of limitations in ways that severed it from its roots: Congress separated the limitations period from the corresponding jurisdictional grant, and broadened the statute of limitations from a targeted one focused on small-dollar damages actions to a general one that controlled all civil actions. See Herr, 803 F.3d at 817 (citation omitted). Congress's actions indicate that it intended § 2401(a) to act as a "standard"—and thus non-jurisdictional—statute of limitations. Id.; see Walters, 725 F.2d at 113. Hence, text, structure, and history all point against a jurisdictional reading of § 2401(a). Given the Supreme Court's clear strictures on this issue, which have undermined the foundations of Spannaus and similar cases, the D.C. Circuit ought to reconsider its § 2401(a) precedents.

where the party is nevertheless harmed by application of the regulation").[8] As the same rule applies to constitutional challenges to agency action, see, e.g., Graceba Total Commc'ns, Inc. v. FCC, 115 F.3d 1038, 1040 (D.C. Cir. 1997); JEM Broad. Co. v. FCC, 22 F.3d 320, 325 (D.C. Cir. 1994), Count II—plaintiffs' claim that CARRP violates Article I, Section 8 and the separation of powers—is also timely.

But what about plaintiffs' procedural APA claim (Count V)? Unlike claims of substantive invalidity, "challenges to the procedural lineage of agency regulations," whatever the context in which they are brought, "will not be entertained outside the" limitations period. JEM Broad. Co., 22 F.3d at 325. And what of Karami's as-applied due process claim (Count IV)?[9] If the government began subjecting Jafarzadeh's application to CARRP soon after he filed it, Karami's claim may have arisen more than six years before this suit was filed. However, application of the discovery rule renders even these claims timely. Under that rule, "a cause of action accrues when the injured party discovers—or in the exercise of due diligence should have discovered—that it has been injured." Hardin, 625 F.3d at 743 (citation omitted); see Merck & Co. v. Reynolds, 559 U.S. 633, 646 (2010). Similarly, the D.C. Circuit has "recognized exceptions to the limitations period when agency action fails to put aggrieved parties on reasonable notice of the rule's content." JEM Broad. Co., 22 F.3d at 326; see RCA Glob. Commc'ns, Inc. v. FCC, 758 F.2d 722, 730 (D.C. Cir. 1985) ("[S]elf-evidently the calendar does not run until the agency has decided a question in a manner that reasonably puts aggrieved parties on notice of the rule's content.").

---

[8] A recent D.C. Circuit case, Washington Alliance of Technology Workers v. DHS, 892 F.3d 332, 342 (D.C. Cir. 2018), dismissed on statute of limitations grounds a claim that a DHS program, promulgated through an old rule, exceeded DHS's statutory authority. However, dismissal of that claim did not ultimately matter to the court's analysis, because passage of a newer rule left the statutory authority question on the table. See id. Perhaps for that reason, the court did not acknowledge or grapple with the many other D.C. Circuit decisions allowing such claims to be heard outside the limitations period. See id.

[9] Since Count I does not plead a separate basis of liability but rather asks only for a particular remedy, see infra Part II, the statute of limitations issue is ultimately irrelevant to that count.

Plaintiffs allege that CARRP was a secret program when it was enacted in 2008. See Am. Compl. ¶ 29. In fact, CARRP was unknown to anyone outside the government until it was discovered in a court case that was filed in 2010 and decided in 2012, and USCIS released no details about CARRP to the public until it was forced to respond to Freedom of Information Act (FOIA) requests and litigation beginning in 2012. Wagafe, 2017 WL 2671254, at *1 (citing ACLU of S. Cal. v. USCIS, 133 F. Supp. 3d 234, 238 (D.D.C. 2015), and Hamdi v. USCIS, No. EDCV 10-894 VAP (DTBx), 2012 WL 632397 (C.D. Cal. Feb. 25, 2012)).[10] As plaintiffs allege that applicants are never told that they are subjected to CARRP, Am. Compl. ¶ 39, both their complaint and common sense suggest that plaintiffs did not discover Jafarzadeh's subjection to CARRP before the program became public. Nor does the government claim in its sentence-long footnote raising the statute of limitations that plaintiffs could have discovered their CARRP-related injury through due diligence prior to CARRP's disclosure. Thus, under the discovery rule, plaintiffs' claims did not accrue until at least 2012. Counts IV and V, like the rest of the amended complaint, are therefore timely.[11] Hence, the Court will deny the motion to dismiss under Rule 12(b)(1).

---

[10] It appears that CARRP's first exposure to the general public, beyond those involved with Hamdi and the 2012 FOIA requests, came in an August 2013 report issued by the ACLU of Southern California in concert with the Lawyer's Committee for Civil Rights of the San Francisco Bay Area and Mayer Brown. See Jennie Pasquarella, Muslims Need Not Apply (Aug. 2013), https://www.aclusocal.org/sites/default/files/carrp-muslims-need-not-apply-aclu-socal-report.pdf; Miriam Jordan, Citizenship Agency Faulted Over Delays for Muslim Applicants, Wall St. J. (Aug. 21, 2013, 1:07 AM), https://www.wsj.com/articles/citizenship-agency-faulted-over-delays-for-muslim-applicants-1377061643. However, the Court will assume that the clock started with the 2012 FOIA responses.

[11] The D.C. Circuit has explicitly left open the question whether the discovery rule applies to actions subject to § 2401(a), or to procedural challenges to agency action. See Hardin, 625 F.3d at 743. However, the Supreme Court has held several times that "limitations principles should generally apply to the Government 'in the same way that' they apply to private parties." Scarborough v. Principi, 541 U.S. 401, 421 (2004) (citation omitted). Even hewing to the D.C. Circuit's baseline that § 2401(a) is jurisdictional, that determination can and should be read in harmony with these more recent Supreme Court cases. The Court will not cut off the discovery rule in suits with government defendants when it would apply in suits against private defendants.

## II.    CLAIM FOR USCIS DECISION EXCLUSIVE OF CARRP (COUNT I)

Plaintiffs' first claim is not really a claim at all. Rather, Count I of the amended complaint asks for a "decision by USCIS exclusive of CARRP." Am. Compl. at 10. It alleges that Jafarzadeh has met all of the statutory requirements to become an LPR, but that USCIS unlawfully refused to exercise its discretion in deciding on his application and instead delegated its authority to the FBI through the TSDB. Id. ¶¶ 51–52. It also states that Jafarzadeh has exhausted all other avenues for relief. Id. ¶ 53. These allegations are essentially the same ones that undergird Counts II and III, the separation of powers and substantive APA claims. See id. ¶¶ 54–59. No separate legal basis for liability is mentioned in Count I; the claim appears merely to request a particular form of relief that is also included in the Prayer for Relief. Therefore, Count I will be dismissed.

## III.    SEPARATION OF POWERS CLAIM (COUNT II)

Plaintiffs allege that "CARRP violates the separation of powers" because "only Congress has the authority to 'establish an uniform Rule of Naturalization." Am. Compl. ¶ 55 (quoting U.S. Const. art. I, § 8, cl. 4). According to the complaint, "CARRP creates additional, secret, non-statutory, substantive criteria that applicants must meet before USCIS will grant an application for adjustment of status." Id. ¶ 56. CARRP allegedly allows USCIS to skirt Congress's determination of which national security concerns warrant a finding of inadmissibility by defining "national security concerns" more broadly, and flouts Congress's decision to give DHS exclusive statutory authority over adjustment of status applications by delegating authority to other agencies to predetermine who should be denied. Id. Plaintiffs claim that these illegal flaws in the CARRP program caused the delay and denial of Jafarzadeh's LPR application. Id. ¶ 57.

The government's motion to dismiss focuses on plaintiffs' standing to bring this separation of powers claim. But the government (briefly) makes a feint toward a merits argument as well.

<u>See</u> 2d Mot. to Dismiss at 13–14. The Court need not respond to each of the government's assertions, because plaintiffs' concerns are better addressed by another count of their complaint. <u>Cf.</u> <u>Ashwander v. Tenn. Valley Auth.</u>, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter."). In stating that CARRP casts a wider net than does the INA, and delegates authority to agencies to which the INA did not grant such power, plaintiffs are claiming that CARRP is inconsistent with a statute. This is a classic APA claim. <u>See</u> 5 U.S.C. § 706(2)(C) (compelling courts to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"). The specifics of plaintiffs' allegations are a far better fit for this doctrinal box than they are for a constitutional one. Moreover, judging the constitutionality of action taken by a coequal branch of government is "the gravest and most delicate duty that this Court is called on to perform." <u>Nw. Austin Mun. Util. Dist. No. One v. Holder</u>, 557 U.S. 193, 204 (2009) (citation omitted). The Court must take care not to transform every claim that an agency action conflicts with a statute into a freestanding separation of powers claim. Hence, the Court will dismiss Count Two of plaintiffs' amended complaint. As plaintiffs allege in their substantive APA claim the same infirmities that underlie their separation of powers claim, the Court will be able to consider the allegations fully in that context.

## IV. SUBSTANTIVE APA CLAIM (COUNT III)

Plaintiffs next claim that the denial of Jafarzadeh's LPR application "was an arbitrary and capricious agency action because CARRP is not in accordance with law, is contrary to the Constitution, and abdicates responsibility to apply (not create) the immigration laws." Am. Compl.

¶ 59.[12] The government challenges this substantive APA claim solely by arguing that CARRP is not a final agency action, but rather "an administrative application handling protocol." 2d Mot. to Dismiss at 16. The Court must therefore determine whether the CARRP memo—now provided to the Court—is an action that (1) "mark[s] the 'consummation' of the agency's decisionmaking process," rather than being "tentative or interlocutory"; and (2) is "one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" Bennett v. Spear, 520 U.S. 154, 177–78 (1997) (citations omitted).

The first of these requirements is certainly met. The government argues that CARRP does not "mark the consummation of USCIS's decision-making process on any individual immigration benefit application." 2d Mot. to Dismiss at 16. But this is beside the point. Plaintiffs challenge the 2008 memorandum creating the CARRP program, and this memorandum clearly represents the consummation of the agency's decision-making on the question of how to handle applications of individuals with national security concerns. The "memorandum outlines USCIS policy for identifying and processing cases with national security (NS) concerns," and it explicitly "rescinds existing policy memoranda pertaining to reporting and resolving NS concerns." Memorandum from Jonathan R. Scharfen, Deputy Dir., USCIS, to Field Leadership (Apr. 11, 2008) ("CARRP Mem.") [ECF No. 33-1] at 1.[13] These formal, definite acts were taken by the Deputy Director of USCIS, under a regime which allows the Secretary of Homeland Security to delegate regulatory

---

[12] There is an argument to be made that this claim cannot stand as currently formulated, because it treats the denial itself, rather than CARRP, as the arbitrary and capricious—and thus invalid—agency action. The Court has already held that it lacks jurisdiction to review USCIS's denial of Jafarzadeh's LPR application, and that such a decision does not constitute final agency action reviewable under the APA. See Mem. Op. at 11–12. However, the Court treated an identical substantive APA claim in the original complaint as challenging CARRP rather than the denial itself, id. at 9, 22, and the government treats the claim that way in its current motion to dismiss, see 2d Mot. to Dismiss at 14–18. Given that the Court must "grant[] plaintiff the benefit of all inferences that can reasonably be derived from the facts alleged," Sickle, 884 F.3d at 345 (alterations and citations omitted), the Court still reads the substantive APA claim in plaintiffs' amended complaint as challenging CARRP.

[13] Exhibit 1 to the government's reply [ECF No. 33-1] contains a number of USCIS memoranda pertaining to CARRP. For clarity's sake, the Court will refer to the pagination of the exhibit rather than of each memorandum.

power to him—all signs that CARRP meets the first Bennett prong. See 8 U.S.C. § 1103(a)(4); 8 C.F.R. § 2.1; Soundboard Ass'n v. FTC, 888 F.3d 1261, 1267 (D.C. Cir. 2018). While the CARRP policy would only be "effective upon issuance of each directorate's respective guidance" documents implementing the policy, CARRP Mem. at 2, any finality concerns evaporated when those guidance documents were in fact issued in 2008, see Memorandum from Michael Ayters, Acting Deputy Dir., USCIS, to Field Leadership (Feb. 6, 2009) ("Addt'l Guidance") [ECF No. 33-1] at 30 & n.3. Thus, "the impact of the order is sufficiently 'final' to warrant review in the context of th[is] particular case." Friedman v. FAA 841 F.3d 537, 542 (D.C. Cir. 2016) (citation omitted).

The government concentrates on the second Bennett prong, claiming that no legal consequences flow from CARRP because it "does not change the statutory requirements for any immigration benefit . . . and does not mandate the outcome of any individual case." 2d Mot. to Dismiss at 17. But there are significant indications from the CARRP memo itself that it creates the legal consequences necessary to be considered final agency action. To start, the general language of CARRP suggests that it is binding as a practical matter. CARRP is "a document issued at headquarters [that] is controlling in the field." Appalachian Power Co. v. EPA, 208 F.3d 1015, 1021 (D.C. Cir. 2000). Field officers are bound to follow the procedures and substantive standards CARRP lays out. An NS determination "requires that the case be handled in accordance with CARRP policy." CARRP Mem. at 1 n.1 (emphasis added). Once an application is subject to CARRP, the policy states in specific terms what field officers "must" do and what they are "not authorized" to do. See, e.g., id. at 4 ("When a Non-KST indicator has been identified, the officer must then analyze the indicator in conjunction with the facts of the case . . . and determine whether an articulable link exists [to a prohibited activity, individual, or organization]." (emphasis added)); id. at 6 ("Officers are not authorized to approve applications with confirmed Non-KST NS

concerns without supervisory approval and concurrence . . . ." (emphasis added)). As to the field officers at least, "[i]t commands, it requires, it orders, it dictates." Appalachian Power Co., 208 F.3d at 1023. Officers must "base[] enforcement actions"—their decisions on applications for adjustment of status—"on the policies or interpretations formulated in the document." Id. at 1021. Nor, in contrast to at least one of USCIS's later-issued CARRP guidance memos, does the original memo include boilerplate language stating that it "is intended solely for the guidance of USCIS personnel" and "may not[] be relied upon to create any right or benefit, substantive or procedural." USCIS Mem. on Revision of Responsibilities for CARRP Cases Involving Known or Suspected Terrorists ("Revision Mem.") (July 26, 2011) [ECF No. 33-1] at 58; see also Appalachian Power Co., 208 F.3d at 1022–23 (rejecting argument that similar boilerplate rendered a guidance document nonfinal, as the document still created obligations).

The CARRP memo suggests that legal consequences flow from it for those subject to CARRP adjudication, as well. For instance, as plaintiffs allege, CARRP classifies those on the TSDB who meet certain criteria as KSTs, see Am. Compl. ¶ 31; CARRP Mem. at 1 n.3, thus subjecting them all to CARRP's increased screening requirements. If a KST national security concern is confirmed through vetting, an application for immigration benefits cannot be approved except by senior leadership—even if the application would otherwise warrant approval. See CARRP Mem. at 7; Revision Mem. at 57. These sorts of mandates both restrict agency activities that previously involved greater discretion, see Scenic Am., Inc. v. U.S. Dep't of Transp., 836 F.3d 42, 56 (D.C. Cir. 2016), cert. denied, 138 S. Ct. 2 (2017), and create legal consequences for regulated parties, see Wagafe, 2017 WL 2671254, at *10.

Most importantly, CARRP's definition of "national security concern" covers any "articulable link" to "involvement in" or "association with" an entity or activity that would qualify

for inadmissibility under 8 U.S.C. § 1182(a)(3)(A)–(B), (F). See CARRP Mem. at 1 n.1. However, § 1182 itself seems to set the inadmissibility standard higher, requiring definitive knowledge that an alien has affiliated with a terrorist organization or has engaged in certain terrorist activities. 8 U.S.C. § 1182(a)(3)(B), (F). In some instances, an application can be denied under the INA if there are at least "reasonable grounds to believe" that an alien "is engaged in," "seeks to enter the United States to engage" in, or "is likely to engage" in prohibited espionage or terrorist activities. Id. § 1182(a)(3)(A), (B)(i)(II). Still, CARRP's standard appears to be broader than the statutory one. Changing the standards for denial undoubtedly alters the legal landscape.

Perhaps legal consequences would not flow if CARRP's "articulable link" standard applied only when determining how wide to cast CARRP's net in the first instance, with the INA's inadmissibility standard ultimately determining who is denied. But see Am. Compl. ¶ 35 (alleging that all applications placed in the CARRP process are "steered towards one of two outcomes: delay or denial"). However, the "articulable link" standard does not appear to serve merely as a proxy triggering CARRP review. Rather, an articulable link to activities, individuals, or organizations described in 8 U.S.C. § 1182(a)(3)(A)–(B), (F) appears to remain the touchstone throughout the vetting and adjudication process. See CARRP Mem. at 5 (requiring officers who are conducting external vetting of non-KST NS concerns to "obtain[] from the record owner facts and fact patterns to be used in confirming whether an articulable link exists" between the applicant and a prohibited entity or activity); id. at 1 n.1, 6–7 (warning officers that they "are not authorized to approve applications with confirmed" KST or non-KST "NS concerns" on their own, and defining "NS concern" for purposes of the memorandum using the "articulable link" standard).

There is some indication to the contrary among the other CARRP materials submitted to the Court, but not of a clear enough nature to conclude that plaintiffs have failed to state a claim.

A later guidance memo does tell officers that—at least for those with non-KST NS concerns—"[a]ny denial, referral, or Notice of Intent to Deny (NOID) an application or petition with NS concerns must be based on statutory or regulatory grounds of ineligibility that can be cited in a decision." Addt'l Guidance at 34. But more recent guidance implies that there is a difference between the "articulable link" standard for NS concerns and the INA's inadmissibility standards, and outlines a process for adjudicating KST cases that is at least consistent with plaintiffs' claim that CARRP is geared toward finding a way to deny applications. See Revision Mem. at 2 ("[I]f, after completing the vetting and deconfliction process in KST cases, there continue to be national security concerns, and there is insufficient evidence or other grounds to deny the application, offices are to seek further guidance from their respective HQ Directorate, in consultation with local and HQ counsel when appropriate."); USCIS Operational Guidance for Vetting and Adjudicating Cases with Nat'l Sec. Concerns [ECF No. 33-1] at 30 ("If there are remaining KST NS concerns after receipt of the results from HQFDNS/BCAU, and the individual remains eligible for the benefit, the application/petition must be returned to the respective Field HQ component for further evaluation and coordination with HQFDNS." (footnote omitted)). At this stage, the Court must accept plaintiffs' allegations regarding CARRP as true unless the record before the Court squarely disproves it. And, as explained, the CARRP materials themselves provide some support for plaintiffs' reading of the original CARRP memo and policy. Thus, plaintiffs have plausibly claimed that CARRP meets Bennett's test for final agency action and is subject to the APA.[14]

Other than its bare assertion that CARRP "does not change the statutory requirements for any immigration benefit," 2d Mot. to Dismiss at 17—a statement that is also central to the final

---

[14] Defendants also point to the rule that the APA's "final agency action" requirement prohibits "broad programmatic attacks" on the administration of a program. Norton v. S. Utah Wilderness All., 542 U.S. 55, 64 (2004) (quoted in 2d Mot. to Dismiss at 17). But here plaintiffs point to a discrete agency action: the memorandum instituting CARRP.

agency action question—the government does not argue that CARRP affirmatively complies with the Constitution and the INA. The Court will therefore deny the motion to dismiss Count III and defer that merits question to a later stage. See Fed. R. Civ. P. 12(h)(2) (allowing defendants to raise failure to state a claim defenses in later motions or at trial). The Court's ultimate decision on plaintiffs' substantive APA claim may depend on several issues which are simply not discussed in the papers before the Court. For instance, the strength of plaintiffs' claim may depend on whether and how much the Court must defer to DHS's interpretation of the INA's inadmissibility standards or of its own memo; whether individuals are submitted to the TSDB, and therefore subjected to CARRP, "even if there is no reasonable suspicion that the person is actually involved in terrorist activity," Am. Compl. ¶ 34; and whether CARRP's eligibility assessment process "lead[s] to pretextual denials that lack a legitimate basis in fact and law," id. ¶ 35. Given the limited argument in the briefs, the question whether CARRP is contrary to the INA will be left for another day.

The final element of the APA cause of action that the government has addressed is the availability of a remedy. The APA's waiver of sovereign immunity is limited by Congress's directive "that nothing in the APA 'confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" Spectrum Leasing Corp. v. United States, 764 F.2d 891, 892–93 (D.C. Cir. 1985) (quoting 5 U.S.C. § 702). Thus, if another statute permits suit against the government for the claims being brought but limits the forms of relief available, there is no APA cause of action.

The government notes that, while plaintiffs do not explicitly ask for an injunction to terminate removal proceedings, the relief plaintiffs do seek—a declaration that CARRP is unlawful and a remand to USCIS for reexamination of Jafarzadeh's LPR application free of CARRP— functionally requires such an injunction to have any effect. 2d Mot. to Dismiss at 11. DHS has

the ability to request, and the IJ the power to grant at DHS's request, termination of the removal proceedings or remand to USCIS. See 8 C.F.R. §§ 239.2(c)–(d), 1239.2(c)–(d), 1240.1(a)(iv), 1240.12(c). However, the government claims that any injunction requiring it to terminate removal proceedings would fall afoul either of 8 U.S.C. § 1252(a)(2)(B), which strips courts of jurisdiction to "review" decisions within DHS's discretion, or of § 1252(g), which strips courts of jurisdiction to hear claims arising from certain enforcement decisions. If this is the case, it must be news to the other courts that have already developed and applied standards by which certain agency errors will lead them to terminate removal proceedings. See, e.g., Rajah, 544 F.3d at 446–47. And that is because the government's assertion does not hold water.

Although § 1252(g) does not strip the courts of jurisdiction over Jafarzadeh's claims, the government nevertheless argues that § 1252(g) strips the Court of jurisdiction to grant a remedy that would interfere with removal proceedings. See 2d Mot. to Dismiss at 11–12. But this distinction is "slicing the baloney mighty thin." Sessions v. Dimaya, 138 S. Ct. 1204, 1215 (2018). The language of § 1252(g) does not restrict—or even reference—remedies. It limits only the "cause[s] or claim[s]" over which courts have jurisdiction. 8 U.S.C. § 1252(g). If a "cause or claim" is not barred by the text of § 1252(g), it is unclear why § 1252(g) would nevertheless bar a court from issuing a remedy to resolve that claim. See, e.g., Coleman v. United States, 454 F. Supp. 2d 757, 765–66 (N.D. Ill. 2006). Section 1252(a)(2)(B), meanwhile, only cuts off "review" of decisions that the INA commits to "the discretion of the Attorney General or the Secretary of Homeland Security." 8 U.S.C. § 1252(a)(2)(B). It does not purport to eliminate remedies for claims over which the courts have jurisdiction. And the only decision under review here is the

decision to adopt CARRP, which plaintiffs allege falls outside the discretion the INA grants.[15] Therefore, these provisions do not expressly limit plaintiffs' available remedies.

Of course, § 1252 might still impliedly forbid injunctive relief. See 5 U.S.C. § 702 (denying relief "if any other statute that grants consent to suit . . . impliedly forbids the relief which is sought"). But "[w]hen a statute 'is not addressed to the type of grievance which the plaintiff seeks to assert,' then the statute cannot prevent an APA suit." Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 216 (2012) (citation omitted). Section 1252 is addressed to grievances related to removal orders and certain discretionary decisions. See 8 U.S.C. § 1252. It is not addressed to grievances regarding a mandatory agency policy that applies prior to and outside the removal process. Hence, § 1252 does not impliedly bar relief here.

Indeed, § 1252(f)(1), which the government does not mention, supports the idea that a court could enjoin removal proceedings in some cases. Section 1252(f)(1) is styled a "[l]imit on injunctive relief," and in sweeping terms strips all courts but the Supreme Court of "authority to enjoin or restrain the operation" of certain provisions of the INA "[r]egardless of the nature of the action or claim." 8 U.S.C. § 1252(f)(1). The set of provisions brought within the section's ambit includes those governing the initiation and conduct of removal proceedings. See id. §§ 1229, 1229a, 1252(f)(1). Crucially, however, the section carves out from this ban injunctions "with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." Id. § 1252(f)(1). Jafarzadeh fits this bill: his removal proceedings have been initiated, and the required injunction would apply only with respect to the application

---

[15] Nor for that matter does § 1252(b)(9), which channels to the circuit courts "[j]udicial review of all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien from the United States," cut off relief here. None of the remedies plaintiffs seek would circumvent the administrative process § 1252(b)(9) sets up. Cf., e.g., Hamdi, 620 F.3d at 626 (dismissing case because "§ 1252(b)(9) does operate to preclude the district court from providing the particular relief that Hamdi seeks—judicial review of his mother's order of removal and cancellation of that order").

of the removal provisions to him. Thus, § 1252(f)(1) confirms that § 1252 does not limit plaintiffs' cause of action under the APA. The motion to dismiss Count III will accordingly be denied.

## V. NOTICE-AND-COMMENT CLAIM (COUNT V)

Plaintiffs also claim that CARRP is a legislative rule subject to notice and comment, and that the CARRP memorandum is procedurally invalid because it did not go through notice-and-comment rulemaking. See Am. Compl. ¶¶ 66–70. The government responds that CARRP is a "rule of agency procedure or practice," and thereby exempt from the APA's notice-and-comment requirement. See 2d Mot. to Dismiss at 19.

The APA generally requires agencies to publish proposed rules in the Federal Register and seek public comment before settling on a final version. See 5 U.S.C. § 553(b)–(c). However, these requirements do not apply "to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." Id. § 553(b)(A). The government invokes the exception for "rules of agency organization, procedure, or practice"—or, as the D.C. Circuit refers to such actions, "procedural rules." Elec. Privacy Info. Ctr. (EPIC) v. DHS, 653 F.3d 1, 5 (D.C. Cir. 2011). Unlike a legislative rule, a procedural rule "does not itself 'alter the rights or interests of parties'" or "impose new substantive burdens." Id. (citations omitted). Of course, a procedural rule may still have a "substantial impact" upon those it regulates. Id. The operative question is "whether the substantive effect is sufficiently grave so that notice and comment are needed to safeguard the policies underlying the APA." Id. at 5–6 (citation omitted). The procedural rule exception "must be narrowly construed." Id. at 6 (citation omitted).

The government argues that CARRP is merely a procedural rule because it is "simply part of USCIS's vetting process," 2d Mot. to Dismiss at 20, and thus "merely provides guidance to [USCIS] officials in exercising their discretionary power," id. (quoting Colwell v. HHS, 558 F.3d

1112, 1124 (9th Cir. 2009)). However, for the same reasons why they have stated a claim that CARRP is a final agency action, see supra Part IV, plaintiffs plausibly allege that CARRP goes beyond mere guidance. Plaintiffs assert that CARRP effectively mandates denials for aliens who meet specified criteria. Taking plaintiffs' alleged facts as true—as the Court must at this stage— CARRP does not "genuinely leave[] the agency and its decisionmakers free to exercise discretion," which points toward requiring notice and comment. Cmty. Nutrition Inst. v. Young, 818 F.2d 943, 946 (D.C. Cir. 1987).

Relatedly, CARRP allegedly alters some aliens' legal rights and imposes new burdens on them. "A rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy." Mendoza, 754 F.3d at 1021. That is exactly what plaintiffs allege that CARRP does: it broadens statutory criteria of national security dangerousness, and allows other agencies to exercise a degree of power over applications that runs counter to Congress's decision in the INA to rest such power at the feet of DHS. At least as to the first of these allegations, there is some evidence in the CARRP memorandum itself that CARRP may sweep more broadly than does the INA. See supra Part IV. The government, understandably, contests this. It claims that the CARRP memorandum tells officers to adjudicate applications under the program "consistent[ly] with the criteria for adjustment" in the INA. 2d Mot. to Dismiss at 20. But plaintiffs plausibly assert that the CARRP memorandum's terminology draws a significantly wider circle for delay and probable denial under CARRP than that circumscribed by 8 U.S.C. § 1182, and some of the memo's language on its face supports that claim. Absent more specific response on that score by the government, plaintiffs' allegations stand for now.

The substantive effect of CARRP also cuts against applying the procedural rule exception. One need only look at the front page of this past decade's newspapers to see that both the media and the public at large have focused on the proper balance between pursuing national security interests and safeguarding immigrants' rights. See EPIC, 653 F.3d at 6 (noting public concern and media coverage regarding "issues of privacy, safety, and efficacy" related to TSA policy, suggesting it was a substantive rule). These concerns "no doubt would have been the subject of many comments had [DHS] seen fit to solicit comments upon" the creation of the CARRP policy. Id. Because "the substantive effect [of CARRP] is sufficiently grave," Lamoille Valley R.R. Co. v. ICC, 711 F.2d 295, 328 (D.C. Cir. 1983)—it could spell the difference between retaining and losing the right to remain in this country—the policy of public participation in decision-making that underlies the APA has considerable force here. Particularly given that the procedural-rule exception is to be narrowly construed, the government has not shown that that exception exempts CARRP from notice and comment. As the government points to no other exception to § 553's procedural requirements, the motion to dismiss the notice and comment claim will be denied.

## VI. CLAIM UNDER THE DUE PROCESS CLAUSE (COUNT IV)

Finally, plaintiffs claim in Count IV that the application of CARRP to Jafarzadeh violated Karami's Fifth Amendment right to due process. They allege that Karami has liberty interests in "family unity," "the maintenance and enjoyment of her marriage," and "her right to remain in the United States." Am. Compl. ¶¶ 61–62. By subjecting Jafarzadeh's LPR application to CARRP without notice, and without any process to challenge the basis for his placement in the CARRP program, the government allegedly violated Karami's due process rights. Id. ¶¶ 63–64.

"In the enforcement of the[ immigration] policies, the Executive Branch of the Government must respect the procedural safeguards of due process." Galvan v. Press, 347 U.S. 522, 531 (1954).

To state a procedural due process claim, plaintiffs must plausibly allege, first, that "there exists a liberty or property interest of which a person has been deprived," and second, that the procedures the government provided were constitutionally inadequate. Swarthout v. Cooke, 562 U.S. 216, 219 (2011) (per curiam).[16] A failure at either step will defeat Karami's claim.

The parties fiercely debate whether the liberty interests Karami identifies are protected by the Fifth Amendment in the circumstances of this case. The government points to the D.C. Circuit's decision in Swartz v. Rogers, 254 F.2d 338, 339 (D.C. Cir. 1958), which determined that "the wife has no constitutional right which is violated by the deportation of her husband." While "deportation would put burdens upon the marriage," giving the citizen or LPR spouse "the choice of living abroad with her husband or living in this country without him," the D.C. Circuit held sixty years ago that the plaintiff's claimed rights—to maintenance of her marriage and family unit, and "to live in this country"—were not of constitutional import because "deportation would not in any way destroy the legal union which the marriage created." Id. This case came well before the Supreme Court developed its modern procedural due process jurisprudence in Goldberg v. Kelly, 397 U.S. 254 (1970), and Mathews v. Eldridge, 424 U.S. 319 (1976). Swartz has been cited by no other D.C. Circuit case in the sixty years since it was issued, and the recent district court decisions that rely on it all concern the exception to consular nonreviewability that applies "when the plaintiff is a U.S. citizen or legal resident[] who claims that the decision violated a constitutionally protected liberty interest." Udugampola v. Jacobs, 70 F. Supp. 3d 33, 40 (D.D.C. 2014); see Singh v. Tillerson, 271 F. Supp. 3d 64, 71–72 (D.D.C. 2017); Jathoul v. Clinton, 880 F. Supp. 2d 168, 171–72 (D.D.C. 2012); Mostofi v. Napolitano, 841 F. Supp. 2d 208, 211–13 (D.D.C. 2012).

_____

[16] In addition to the Constitution, protected liberty interests also "may arise from an expectation or interest created by" statute. Wilkinson v. Austin, 545 U.S. 209, 221 (2005). But plaintiffs do not allege in their complaint that Karami's liberty interests arise out of statutory guarantees.

Perhaps, then, one could distinguish Swartz by reading it as a substantive rather than a procedural due process case, since the question there was whether the Fifth Amendment guaranteed a particular outcome—no deportation—rather than a procedure.

This is certainly how plaintiffs hope the Court will view things. They attempt to distinguish Swartz in just this way, arguing that it does not apply because plaintiffs seek only "the lawful adjudication of Plaintiff Jafarzadeh's application" rather than an order "compel[ling] the government to approve [Jafarzadeh's] application." Pls.' Opp'n at 29. They instead ask the Court to follow the reasoning of Escobar v. INS, 896 F.2d 564 (D.C. Cir. 1990), vacated and reh'g en banc granted (D.C. Cir. Apr. 25, 1990), appeal dismissed, 925 F.2d 488 (D.C. Cir. 1991) (mem.), which determined that resident aliens have a "right 'to stay and live and work in this land of freedom,'" and that to seek the Due Process Clause's "right to be heard" a spouse of a removable alien "need show only that a protected liberty interest is at stake, not that the government has no choice but to grant her the ultimate result she seeks," id. at 570 (quoting Landon v. Plasencia, 459 U.S. 21, 34 (1982)). In other words: a resident spouse of an alien has an "interest in the maintenance and enjoyment of her marriage and [an] interest in remaining in the United States," interests which are constitutionally adequate to invoke procedural due process, even if Swartz suggests they are not enough to trigger substantive due process. Id. at 569.

Whether liberty interests can suffice for the former when they do not for the latter is a question the Supreme Court has hotly debated without reaching a definitive conclusion. Compare Kerry v. Din, 135 S. Ct. 2128, 2137 (2015) (plurality opinion) (rejecting the notion that "there are two categories of implied rights protected by the Due Process Clause: really fundamental rights, which cannot be taken away at all absent a compelling state interest; and not-so-fundamental rights, which can be taken away so long as procedural due process is observed"), with id. at 2142

(Breyer, J., dissenting) (differentiating between "procedural" and "substantive" protections and asserting that the plaintiff had a sufficient procedural due process interest in her "freedom to live together with her husband in the United States"). And Escobar never cited or engaged with Swartz, the D.C. Circuit's closest precedent on point. Indeed, Escobar itself is not binding precedent: "the 2-1 panel opinion [was] vacated because a rehearing en banc was granted," thereby depriving it of any precedential value. Bright v. Parra, 919 F.2d 31, 34 (5th Cir. 1990). The appeal was later dismissed, and the underlying district court judgment and complaint were dismissed as moot. See Escobar, 925 F.2d 488. As with Swartz, the D.C. Circuit has never cited Escobar.

So we have one old, (perhaps) not entirely on-point, binding precedent favoring the government's position and one newer, (perhaps) more on-point, non-binding precedent favoring plaintiffs' position. But the law ultimately falls on the government's side here. The district court consular nonreviewability decisions that rely on Swartz, for instance, do not suggest that there is any difference between substantive and procedural due process in their analyses of the plaintiffs' alleged interests. Many of those plaintiffs' claims themselves were procedural, asserting that the denial of their spouses' visas deprived them of constitutionally protected marital interests "without due process." Mostofi, 841 F. Supp. 2d at 211–13; see Udugampola, 70 F. Supp. 3d at 41. True, this Court pointed to Escobar in its prior motion-to-dismiss opinion as perhaps providing a spouse with due process rights in this instance. See Mem. Op. at 25 n.7. And true, Swartz technically did not state that there is no constitutional interest in living in the country or maintaining one's marriage, but rather said that there is "no constitutional right which is violated" by deportation of one's spouse. 254 F.2d at 339 (emphasis added). But the reasoning of the Swartz decision, as well as its holding, remains controlling until the D.C. Circuit or the Supreme Court says otherwise. The Supreme Court has splintered over whether the rights Karami asserts apply to procedural due

process claims in the immigration setting. <u>See Din</u>, 135 S. Ct. at 2138 (plurality opinion) (rights do not apply); <u>id.</u> at 2139 (Kennedy, J., concurring in the judgment) (assuming for sake of argument that rights apply); <u>id.</u> at 2142 (Breyer, J., dissenting) (rights apply). <u>Swartz</u> therefore remains the law of this Circuit, by which this Court is bound. Hence, Count IV of the amended complaint will be dismissed.

## CONCLUSION

For the reasons explained above, the Court finds that it has subject-matter jurisdiction to hear this case. Counts I, II, and IV will be dismissed. The APA claims in Counts III and V, however, have run the gauntlet of the government's present objections, and therefore the motion to dismiss these claims will be denied. None of this is to say that the government may not be successful later on in this suit, particularly if it provides more specific arguments on the remaining claims and if the record, as it develops, shows reality to be closer to the government's conception than to plaintiffs'. At this point, however, the government has not shown that the allegations underlying Counts III and V are implausible. A separate order will issue on this date.

/s/
_____
JOHN D. BATES
United States District Judge

Dated: <u>August 6, 2018</u>